**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

| | | |
|---|---|---|
| MEENU ARYA, NARENDER ARYA, AND SANJAY HOODA, | : | |
| | : | |
| Plaintiffs, | : | NO. 3:17-cv-32-TBR |
| | : | |
| v. | : | |
| | : | |
| AJAY TAXAK, SANJAY TAXAK, DAKSHIN SOUTH INDIAN RESTAURANT, SUBZI MANDI, | : | |
| | : | |
| Defendants. | : | |

<u>**COMPLAINT**</u>

1.      Plaintiffs Meenu Arya, Narender Arya, and Sanjay Hooda (collectively, "Plaintiffs") bring this action against their former employers, Defendants Ajay Taxak, Sanjay Taxak, Dakshin South Indian Restaurant, and Subzi Mandi (collectively, "Defendants") seeking damages and declaratory judgment for Defendants' unlawful conduct, including violations of the Fair Labor Standards Act ("FLSA"), the Kentucky wage and hour laws (K.R.S. Chapter 337), Kentucky human trafficking laws, promissory estoppel, quantum meruit, unjust enrichment, fraud, intentional interference with prospective contractual relations, and conversion.

2.      Plaintiffs are immigrants from India who were lured by Defendants Ajay Taxak and Sanjay Taxak to the Subzi Mandi grocery store and Dakshin South Indian Restaurant in Louisville, Kentucky, with the promise of a job, housing, food, and immigration-related assistance.

3.      Once Plaintiffs began working for Defendants in Louisville, Defendants exploited Plaintiffs' immigrant status and lack of resources to obtain cheap, forced labor in violation of multiple laws, and thereby obtained an unfair advantage over other businesses. Defendants forced Plaintiffs to work in unsanitary conditions for significantly less than the wages required

by law, and less than Defendants promised to pay, by inducing Plaintiffs' cooperation with false representations, confiscating Plaintiffs' passports, and intimidating and threatening Plaintiffs with serious bodily injury.

4. Plaintiffs seek a declaration that their rights have been violated and an award of damages.

## JURISDICTION

5. This Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 29 U.S.C. § 216(b) (authorizing FLSA lawsuits), 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1337 (actions arising under Acts of Congress regulating commerce).

6. The Court has supplemental jurisdiction over Plaintiffs' causes of action based on state law pursuant to 28 U.S.C. § 1367 because these claims are related to the federal claims such that they form part of the same case or controversy.

## VENUE

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

8. One or more of the Defendants reside in this district.

9. A substantial part of the events or omissions giving rise to the claims occurred within the Louisville jury division.

## PARTIES

10. Plaintiffs Meenu Arya ("Meenu") and Narender Arya ("Narender," and, together with Meenu, "the Aryas") are Indian citizens and currently reside in Chicago, Illinois. Meenu and Narender Arya have been married since October 2009. They each currently hold T Nonimmigrant Statuses (T visas), which grant them T Nonimmigrant Statuses.

11.     Plaintiff Sanjay Hooda ("Hooda") is an Indian citizen and currently resides in Chicago, Illinois.  Mr. Hooda currently holds a T-Visa.

12.     Defendant Ajay Taxak ("Ajay") is a natural person.  On information and belief, Ajay Taxak currently resides in Louisville, Kentucky, within Louisville/Jefferson County.

13.     Defendant Sanjay Taxak ("Taxak") is a natural person.  Sanjay Taxak is the brother of Ajay Taxak (collectively, the "Taxak brothers").  On information and belief, Sanjay Taxak currently resides in Louisville, Kentucky, within Louisville/Jefferson County.

14.     Defendant Subzi Mandi is a grocery store with principal place of business in Louisville, Kentucky.  Subzi Mandi was engaged in interstate commerce in that it processed credit card transactions with customers, and it sourced a portion of its inventory from warehouses or suppliers located outside of Kentucky.  On information and belief, one or both of the Taxak brothers owned Subzi Mandi at all relevant times and continue to own it.

15.     Defendant Dakshin South Indian Restaurant ("Dakshin") is a restaurant with principal place of business in Louisville, Kentucky.  Dakshin is located one door down from Subzi Mandi in the same plaza.  Dakshin was engaged in interstate commerce in that it allowed customers to pay with credit cards and, on information and belief, sourced food to be served to customers from suppliers located outside of Kentucky.  On information and belief, Sanjay Taxak owned Dakshin at all relevant times and continues to own it.

## FACTS

**Plaintiff Sanjay Hooda**

***The Taxak Brothers Lure Hooda to Work at Subzi Mandi***

16.     In December 2009, Hooda fled to the United States seeking asylum due to violence arising out of political conflicts near his home in Haryana, India.  After arriving in Philadelphia, Pennsylvania, where he knew a friend from his home town in India, Hooda began

working at a gas station convenience store.  Through his connections in Philadelphia, Hooda was put in contact with Ajay Taxak, in Louisville, Kentucky.

17.     Hooda spoke with Ajay for the first time in November 2011, over the telephone.

18.     During that call, Ajay told Hooda that, like Hooda, he was also from Haryana, India, and that they knew some of the same people in India.

19.     Also during that call, after learning of Hooda's status as an immigrant, Ajay promised to provide Hooda with a good job, room and board, and legal assistance with his immigration status if Hooda would come to Louisville.

20.     Shortly after their phone conversation, Ajay contacted Hooda and asked Hooda to send him $1,500.  Ajay told Hooda that, if Hooda provided the $1,500, Ajay would follow through with his promises of a job, housing, food, and assistance with his immigration status. Ajay told Hooda that he would return the money when Hooda arrived in Louisville.

21.     In reliance on Ajay Taxak's promises, and believing that he could trust Ajay because they were from the same part of India and had acquaintances in common, Hooda sent $1,500 to Ajay with the expectation that Ajay would repay him.

22.     Hooda obtained the money by asking his manager at the gas station for an advance on wages, and his manager agreed and helped him wire the money to Ajay.

23.     In January 2011, Hooda travelled by bus to Louisville to accept Ajay's offer to provide employment and immigration-related assistance.

24.     During his first night in Louisville, Ajay took Hooda to some of the Taxak family's businesses, including the Subzi Mandi grocery store.

25.     At the Subzi Mandi grocery store, Ajay introduced Hooda to Ajay's brother, Sanjay Taxak.

26.     On information and belief, the Taxak brothers jointly owned Subzi Mandi.

27.     During their meeting, the Taxak brothers offered Hooda a job at Subzi Mandi and promised to pay him for his labor at a rate of approximately $1,600 per month, provide him with room and board, and help him obtain legal assistance in connection with his immigration status.

28.     The next day, Hooda began working at Subzi Mandi.

*Ajay Confiscates Hooda's Immigration Documentation and Valuables*

29.     After Hooda agreed to work at the grocery store, Ajay took Hooda's passport and other identification-related documentation.  Ajay additionally took all of Hooda's money, including $1,400.

30.     When added to the earlier $1,500 loan, Ajay had taken a total of $2,900 from Hooda.

31.     Ajay lied to Hooda, stating that he was only holding Hooda's identification documents and money for safekeeping.

32.     Hooda, who was in need of employment and immigration-related assistance, trusted Ajay and relied on his false representations.

33.     In fact, Ajay intended to control Hooda's identification documentation in order to restrict Hooda's ability to leave, and divert the money for his own purposes.

34.     Hooda later requested the return of his documents and his money on multiple occasions, but Ajay refused to return them.

**The Taxak Brothers Provide Uninhabitable Housing to Hooda**

35.     The Taxak brothers initially provided housing to Hooda that consisted of a dirty back-room in the Dakshin restaurant building in an area shared by eleven other workers.  On information and belief, many of the other workers were undocumented immigrants.  Hooda's

room was filled with restaurant supplies, and did not contain any furniture—not even a mattress or blankets.  Hooda slept on a carpet and used a tablecloth for warmth.

36.     After a few months, Ajay procured a mattress at Hooda's request, and took $200 out of Hooda's compensation to pay for it.

37.     In or around 2013, public employees, who may have been from the local fire department, visited Dakshin and became aware that Hooda and other workers were residing in the back of the restaurant.  Hooda believes that the public employees threatened to shut down the restaurant if the workers continued living there.

38.     The Taxak brothers moved Hooda and the other workers to a small house, then back to Dakshin, and finally across the street to a former dental clinic that had been converted into a house.

39.     Despite the change in location, the living conditions remained intolerable.  There were approximately eight to eleven people living in the house at various times, including Hooda and the Aryas.  Hooda was assigned to share a small room with the manager of the Dakshin restaurant, Navneet Singh, who was called "Neetu," and another worker.

40.     Neetu would often consume alcoholic beverages and become violent and abusive towards Hooda and the others in the house.  On two or three different occasions, Neetu got drunk and physically assaulted Hooda.

### *Hooda Works Long Hours at Subzi Mandi under Poor Conditions*

41.     Hooda had met with Sanjay Taxak on his first day working at Subzi Mandi.

42.     During that meeting, Taxak had told Hooda that he and Ajay would pay Hooda $1,600 a month for his work at Subzi Mandi.  Taxak also had promised Hooda that he would hire a lawyer on Hooda's behalf to provide immigration-related assistance.

43.     Despite these promises, the Taxak brothers failed to pay Hooda on a monthly basis as promised for the first year and a half, and paid him significantly less than required by federal and Kentucky minimum wage laws.

44.     Additionally, on information and belief, while they contacted a lawyer on Hooda's behalf, the Taxak brothers never paid that lawyer for any work on his behalf.

45.     Hooda's work at Subzi Mandi included processing sales of groceries to customers, ordering inventory from stores and vendors, cleaning, unloading of goods and produce from trucks, repairs and construction work.

46.     In the course of his work, Hooda engaged directly in interstate commerce by placing orders over the telephone for inventory at Taxak's direction from stores and vendors located in other states, including, for example, from Deep Food, Inc.'s locations outside of Kentucky. On information and belief, Deep Food, Inc. is located in New Jersey and maintains a warehouse in Illinois.

47.     Hooda also engaged in interstate commerce when he received inventory from suppliers located in states other than Kentucky, unloaded those goods from trucks moving between states, and processed sales transactions involving those goods.

48.     From January 2011 until about June 2011, Hooda worked approximately 98 hours per week. Hooda worked Tuesday through Sunday, starting at approximately 9:00 A.M. On Tuesday, Wednesday, Friday, and Sunday, he worked until 10:00 PM, took a short break for dinner, and then continued working until 1:00 A.M. or 2:00 A.M. On Thursdays and Saturdays, Hooda was required to stay until about 2:00 A.M. or 3:00 A.M. to unload the delivery truck.

49.     From about July 2011 through about the end of October 2013, Hooda worked approximately 85 hours per week. Hooda worked Tuesday through Sunday, starting at

approximately 9:00 A.M.  On Tuesday, Wednesday, Friday, and Sunday, he worked until 10:00 PM.  On Thursdays and Saturdays, Hooda was required to stay until about 2:00 A.M. or 3:00 A.M. to unload the delivery truck.

50.     From about November 2013 until June 2014, Hooda worked approximately 80 hours per week pursuant to the same schedule, but staying only once per week to unload the regularly scheduled deliveries, as the delivery frequency had been reduced.

51.     At least three additional times per month, Hooda was required to stay until about 2:00 A.M. or 3:00 A.M. to receive various other deliveries.

52.     Although Monday had been designated as Hooda's day off, Defendants often forced Hooda to work on Mondays.  Sometimes, the work consisted of manual labor on the Defendants' farm, and other times it consisted of running various errands for family's numerous businesses.

53.     Defendants allowed Hooda to take a fifteen-minute lunch break and refused to allow any other breaks.  Hooda's lunch break was scheduled for 2:00 P.M., but sometimes would not occur until 4:00 P.M. or 5:00 P.M.

54.     Hooda suffers from severe back pain and would sometimes ask to rest, but the Taxak brothers denied Hooda's requests.

55.     Defendants kept the store at unbearable temperatures.  Hooda was not allowed to turn on the heat in the winter.  Taxak threatened to punish and beat Hooda if he used the heater.

56.     As a result of the cold temperatures, Hooda became sick and suffered from fevers and shortness of breath on numerous occasions.  Taxak required Hooda to work despite any type of sickness.

*Compensation and Other Monies Owed to Hooda*

57.     Although Hooda worked over 80-hour weeks, Defendants refused to pay him as promised for the first year.

58.     When Hooda demanded payment of the wages he had been promised, the Defendants generally paid amounts averaging around $200 or $300 at a time.  Defendants falsely told Hooda that they were holding onto the remaining amounts owed for safekeeping.

59.     In June and July 2011, Hooda was paid $1,600 per month.

60.     In August 2011, Ajay promised Hooda a raise from $1,600 to $1,800 per month, but Ajay did not pay Hooda anything for that month.

61.     Hooda subsequently demanded repayment from Ajay for the unpaid wages from 2011 and the $2,900 that Ajay had initially taken from him.  Hooda had compiled a list reflecting the amounts owed, which he showed to Ajay.  Ajay initially agreed to pay Hooda and kept the list Hooda had created.

62.     In approximately December 2011 or January 2012, Hooda received approximately $1,800 each month in wages.

63.     From approximately February 2012 through February 2014, Hooda received approximately $2,000 per month in wages.

64.     From approximately March 2014 through June 2014, Hooda received approximately $2,500 per month in wages.

65.     The amounts that Hooda received were significantly lower than the amount required by federal and Kentucky minimum wage laws for each hour worked in each work week during his employment, which would have been approximately $78,000.

66.     Defendants never provided Hooda with any back pay for the first year that he went without pay.

67. Defendants never gave Hooda any pay records.

68. Hooda also continued to seek payment of the amounts that Ajay had borrowed and the return of his property.

69. Eventually, Ajay told Hooda that he no longer had Hooda's money and that there was nothing Hooda could do about it. Ajay told Hooda that he could not report Defendants to law enforcement authorities without being arrested due to his immigration status.

***Taxak's Interferes with Hooda's Job Offer***

70. Taxak prevented Mr. Hooda from working for other employers in Louisville.

71. In or about 2013, a customer at Subzi Mandi offered Hooda a job at his local gas station. Hooda accepted the gas station owner's offer.

72. After not hearing from gas station owner, Hooda called to inquire as to when he could begin. The gas station owner told Hooda that he could not hire Hooda because Taxak told him he could not hire Taxak's employees.

73. Upon information and belief, Taxak threatened local businesses to keep them from hiring Hooda and other employees of the Taxak brothers. As a result, Hooda continued to work for the Defendants.

***The Taxak Brothers Violate their Promise to Pay for Hooda's Immigration Assistance***

74. Throughout his time working at Subzi Mandi, Hooda repeatedly asked Taxak about the progress of his immigration case and asked him to take Hooda to see his immigration lawyer.

75. Taxak refused to provide information.

76. Taxak took Hooda to see a lawyer once and to one or more court dates.

77. At one point, the lawyer called Subzi Mandi and told Hooda that Taxak was not accepting his calls.

78.     The lawyer once visited Subzi Mandi because Taxak had not paid him. That day, Hooda paid him $250 for his time in court.

79.     The lawyer ultimately either declined to represent Hooda, or withdrew from representing Hooda, because Taxak failed to pay him and refused to bring Hooda to meetings with the lawyer.

80.     After the withdrawal of representation by the lawyer, Taxak took Hooda to court for the second hearing, telling Hooda that Taxak knew more than the lawyer and would represent Hooda himself.

81.     When Hooda realized that the Taxak brothers would not stand by their promise to assist him with obtaining legal assistance relating to his immigration status, Hooda asked them to return his passport and immigration papers.

82.     In response, the Taxak brothers each refused to return Hooda's immigration documentation and threatened to physically injure Hooda if he kept asking questions about it.

***Taxak Threatens Hooda with Physical Violence***

83.     Taxak frequently threatened and intimidated Hooda.

84.     Once, Taxak beat Hooda for turning on the heat at the store during the winter.

85.     Taxak owned a gun, and kept it in his car.

86.     Taxak showed his gun to Hooda on a regular basis while making threats about what would happen if Hooda failed to do the work Taxak demanded or stole from him.

87.     Taxak told Hooda that if he saw Hooda not working during working hours then Hooda would not be happy with what Taxak would do to him

88.     Hooda believed that the Taxak brothers would act on these threats because he had previously witnessed them inflicting physical abuse on other workers, including an occasion during which Taxak caused severe injury to another worker.

89.     Even after Hooda later escaped to Chicago, Taxak continued to threaten him whenever Hooda called to ask for the return of his passport and immigration papers, saying that he would beat Hooda if he ever saw him in Louisville again.

**Plaintiffs Meenu and Narender Arya**

***Taxak Lures the Aryas to Work at Dakshin***

90.     On April 26, 2013, the Aryas traveled to the United States from India on tourist visas.  They had booked return tickets for January 2014 and planned to stop in Louisville, Kentucky to visit a friend and former neighbor from India before going home.

91.     In late November 2013, the Aryas arrived in Louisville to visit their friend.  While visiting their friend, the Aryas were introduced to Taxak.

92.     Taxak offered to hire the Aryas for $600 per week if they wanted to stay in the United States and work for him at his restaurant, Dakshin.  In exchange for their labor, Taxak promised the Aryas wages of $600 per week, lodging, food, and legal assistance obtaining authorization to stay and work in the United States.

93.     A few days later, the Aryas accepted Taxak's offer.

***Taxak Provides the Aryas with the Uninhabitable Housing***

94.     Taxak housed the Aryas in the same former dental clinic in which Hooda lived.

95.     Taxak initially said he would have the house cleaned and provide bed linens and blankets.  But, the house was never cleaned, and the Aryas did not receive bedding.  The Aryas slept on the floor for approximately two months until they purchased their own mattress.

96.     The other residents of the former dental clinic made it an unsafe and hostile environment.  Neetu, the manager of the Dakshin restaurant, often got drunk and made abusive and insulting comments towards the Aryas.  When Meenu became pregnant in February 2014

and suffered from morning sickness, the living environment became more difficult and Neetu's insults only increased.

***Taxak Confiscates the Aryas' Passports and Violates His Promise to Provide Immigration Assistance***

97.    Shortly after the Aryas began working at Dakshin, in or about February 2014, Taxak falsely told the Aryas that he needed their passports so that the attorney he hired could process their immigration passport. On information and belief, Taxak actually wanted to hold the Aryas' passports to restrict their ability to leave Dakshin, and Taxak never paid for an attorney on the Aryas' behalf.

98.    In reliance on Taxak's intentional misrepresentation, the Aryas gave their passports to him. Taxak did not return their passports for several months, until late June 2014.

***The Aryas Work Long Hours at Dakshin under Poor Conditions***

99.    The Aryas worked at the Dakshin restaurant six days a week, during which they were seldom allowed to sit down or take breaks.

100.    They typically were permitted to take a day off on either Tuesday or Wednesday each week, but there were a few weeks in which they worked all seven days.

101.    On a work day, the Aryas typically worked their first shift from 10:00 A.M. through approximately 2:30 P.M., a second shift from 4:45 P.M. to sometime between 10:00 P.M. and 11:00 P.M, and were forced to stay even later to cook for the other workers through 12:30 A.M. or 1:00 A.M. This was extended by an hour on Fridays and Saturdays, when the restaurant stayed open until 11:00 P.M.

102.    Narender's morning shift work at the Dakshin restaurant included cleaning the bathroom and vacuuming the floors. Meenu's morning work at Dakshin included preparing salads in the kitchen.

103.    During the daily lunch buffet from approximately 11:00 A.M. to 2:30 P.M., the Aryas cleared used dishes and food from the tables after customers finished eating.  After the lunch buffet, the Aryas cleaned any remaining used tables, brought all leftover food to the kitchen, and then were permitted to take a break until the dinner shift began at 4:45 P.M.

104.    In preparation for the dinner shift, Narender would vacuum the floors a second time and clean the tableware.  Meenu set up the tables for customers, including by placing the silverware and dishes on the tables.

105.    During the dinner shift, Narender would take food orders from customers and clean the utensils.  Meenu's role was to bring the food out from the kitchen and serve it to customers.  The dinner shift typically ended around 10:00 P.M. or 10:30 P.M., when all customers had left.  On Fridays and Saturdays, the dinner shift typically lasted until 11:00 P.M. because customers stayed later into the night.

106.    On some days, after the dinner shift, Neetu would require that Meenu cook for him and certain other workers, which typically included approximately five other people.  On those days, the Aryas were not able to leave Dakshin until 12:30 A.M. or 1:00 A.M.

107.    The Aryas were not permitted to take time off from work—even to see a doctor.

108.    Narender suffered terrible diarrhea and hemorrhoids as a result of the spoiled food used at Dakshin, which was sourced from Subzi Mandi.  He was not permitted to see a doctor.

109.    Similarly, Meenu was generally refused time off when she was feeling ill.

110.    Taxak told the Aryas that they did not have a choice, and they must work even when sick or they would never get immigration assistance.

111.    Almost every day, for approximately half an hour, Taxak came to Dakshin to observe the workers.  During that time, he was verbally abusive to the Aryas.  He would raise his voice and use swear words directed at them.

112.    On the Aryas' day off each week, Narender sometimes worked on Defendants' farm, including by feeding chickens.  Defendants never paid Narender for his farm work.

***Compensation Owed to the Aryas***

113.    The Aryas did not receive any compensation for their first month of work at Dakshin in December 2013.

114.    When they asked Taxak for payment, Taxak told them that it was a trial period for them to learn their job, and that their compensation was being used to cover their housing, food, taxes, and immigration lawyers on their behalf.

115.    But, Taxak never hired immigration counsel for the Aryas or provided any documentation to the Aryas supporting that funds were being paid towards taxes or immigration counsel on their behalf.

116.    In addition, the housing and food that Taxak provided was worth significantly less than the Aryas' labor under prevailing minimum wage laws.

117.    From January 2013 to April 2014, Taxak paid Meenu Arya approximately $1,200 per month—significantly less than required by minimum wage laws and less than the $600 per week that Taxak had agreed to pay.

118.    During the same period, Narender Arya was paid in cash from customer tips at the end of each work day in amounts ranging from approximately $20 to $50 per day.  Meenu Arya did not receive any share of customer tips.

119.    Tips were unfairly distributed.  Customer tips at Dakshin were pooled, divided and distributed by Neetu or another management employee.  Neetu and the other management

employee handled collection of all customer payments and tips at Dakshin, including processing credit card transactions.

120.    Neetu and the other management employee refused to provide information to the Aryas about the total amount of tips collected each day or how tips were being divided between employees.

121.    The Aryas noticed, however, that the amounts Narender received were not proportional to the amount of business each day, and Meenu received no share in the tip pool.

122.    The Aryas confronted Taxak many times to ask him to pay what he had promised, the rate of $600 per week, and to distribute tips evenly.

123.    Taxak responded by falsely representing to the Aryas that he was using the outstanding compensation to pay taxes and hire counsel to assist them with immigration matters.

124.    Taxak never hired counsel to assist the Aryas, and he never provided documentation to the Aryas reflecting any payment of taxes on their behalf.

125.    In March or April 2014, the Aryas felt that they could no longer live in the former dental clinic because of the filth and Neetu's abusive behavior towards Meenu, who was pregnant.  Narender confronted Taxak about Neetu's harassment of Meenu.  In response, Taxak refused to help the Aryas find alternative housing and made statements in which he implied that he would physically harm Narender if Narender continued to complain.

126.    Around the same time, the Aryas confronted Taxak about the immigration assistance he had promised to procure.  The Aryas were worried about potentially overstaying their tourist visas, as they were approaching the expiration date.  Taxak again falsely told the Aryas that their unpaid wages were being used to pay an immigration attorney.

127.     Starting in May 2014, Taxak stopped paying the Aryas entirely.  The Aryas continued to work through May and June 2014 but did not receive any compensation.  On information and belief, Taxak stopped paying the Aryas because he intended to prevent them from having any means to leave their employment at Dakshin.

128.     To summarize, the amounts that the Aryas received were significantly lower than the amount required by federal and Kentucky minimum wage laws for each hour worked in each work week during their employment, which would have been approximately $26,500.

***Taxak and His Agent Physically Beat Narender, Harass Meenu, and Threaten Hooda***

129.     On June 26, 2014, Narender again confronted Taxak to ask for payment of outstanding wages, information on the status of the legal assistance with immigration status, and assistance with addressing Neetu's abusive behavior at the house.

130.     In response, Taxak swore at Narender, accusing him of asking too many questions.  When Narender asked Taxak not to swear at him, Taxak grabbed Narender by the collar, dragged Narender through Dakshin, and hit Narender in the neck with his fist.

131.     Hooda was present at Dakshin, and witnessed Taxak's actions of grabbing Narender's collar and dragging him.

132.     The next morning, the Aryas tried to contact Taxak to ask for the return of their passports.  Taxak did not answer his cellular telephone and was not present at Dakshin.

133.     When the Aryas arrived at Dakshin, they were met by Jashbir Singh, Taxak's nephew.  It was unusual for Singh to appear at Dakshin.

134.     Singh approached Narender without saying anything and struck Narender in the face, knocking him to the floor and causing him to injure his arm.  Singh punched Narender multiple times in the face and back, while stating that he should have listened to Taxak and "who

do you think you are talking to my uncle [Taxak] like this and asking so many questions?" Singh's actions caused Narender to bleed profusely.

135.    Meenu, who was visibly pregnant at that time, yelled at Singh to stop.  In response, Singh shoved Meenu very hard, causing Meenu to fall to the floor.  Singh then tried to kick Meenu in the abdomen, but Narender was able to cover her and took the brunt of Singh's foot.

136.    Hooda was present at Dakshin and witnessed Singh's actions.  When Hooda tried to intervene to help Narender, Singh aggressively grabbed Hooda's hand and threatened to beat up Hooda too.

137.    As the Aryas left the Dakshin restaurant, bloody and crying, they saw Taxak waiting outside.  Narender asked Taxak if this was his plan all along.  Taxak responded by laughing.  Taxak later told Narender that he would have beat Narender himself but did not want to give the appearance that he abused his employees.

138.    Narender asked Taxak to return the Aryas' immigration documents.  Taxak finally returned the Aryas' passports and threatened them, stating, "if I see you again in this area I'll break your legs and hands.  I'll show you what I can do to you if you fight with me again."

139.    Once the Aryas and Hooda arrived back at the house, the Aryas went inside to collect their belongings.  Hooda remained outside to call a friend for help.

140.    While Hooda was outside, Taxak arrived at the house.  Taxak showed Hooda the gun in his car and threatened to shoot Hooda.

141.    Shortly thereafter, Hooda's friend arrived and transported the Aryas and Hooda to a friend's house.

142.    The Aryas later went to the hospital for treatment of their injuries, and they filed a police report.

143.    A related criminal case is pending against Singh in the matter of *Commonwealth v. Singh*, No. 8014047393, Jefferson County District Court, Louisville, Kentucky, filed July 16, 2014.

144.    Subsequently, the Aryas moved to Chicago to stay with a family friend.

145.    Hooda remained in Louisville for a few days, staying with a friend, to try to recover his immigration documents from Taxak.

146.    Hooda begged Taxak to return his passport, immigration documentation, and money owed. But, Taxak refused to return Hooda's documentation, claiming that he did not have it, and threatened to break Hooda's legs if he ever saw Hooda again.

147.    Shortly thereafter, Hooda joined the Aryas in Chicago.

## FIRST CAUSE OF ACTION
## FLSA—MINIMUM WAGES AND OVERTIME COMPENSATION VIOLATIONS
### (Against All Defendants)

148.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully here.

149.    At all relevant times, the Aryas were employed by Defendants Sanjay Taxak and Dakshin within the meaning of the terms employer, employee, and employ in 29 U.S.C. § 203(d), (e)(1), and (g). Likewise, at all relevant times, Hooda was an employee of Defendants Sanjay Taxak, Ajay Taxak and Subzi Mandi, within the statutory definitions.

150.    At all relevant times, Dakshin and Subzi Mandi were an enterprise, controlled by the Taxak brothers, engaged in interstate commerce.

151.    Hooda, as an employee at Subzi Mandi, was engaged in interstate commerce in that he processed credit card transactions with customers and purchased, received, handled and sold goods received from vendors or suppliers located outside of Kentucky.

152.    The Aryas also engaged in interstate commerce to the extent they handled and served food that, on information and belief, was sourced from other states.

153.    Defendants violated Plaintiffs' rights by failing to pay them the applicable minimum wage for every compensable hour of labor performed, including overtime wages, in violation of 29 U.S.C. §§ 206(a) and 207(a).

154.    Defendants' failure to pay Plaintiffs proper minimum and overtime wages were willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a), as reflected by:

   a.  Defendants' oral promise to pay the Plaintiffs less than required by law,

   b.  Defendants' actions in confiscating Plaintiffs' passports and immigration-related documentation, and

   c.  Defendants' threats of serious bodily injury to Plaintiffs.

155.    On information and belief, Defendants also failed to make and maintain pay records as required by 29 U.S.C. § 211(c).

156.    As a result of Defendant's willful violation of FLSA, Plaintiffs are entitled to declaratory judgment and damages in the amount of their unpaid minimum and overtime wages, plus an additional and equal amount in liquidated damages, reasonable attorneys' fees, and costs of this action, pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
## KENTUCKY MINIMUM WAGES AND OVERTIME COMPENSATION VIOLATIONS
### (Against All Defendants)

157. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully here.

158. At all times relevant to this action, the Aryas were employed by Defendants Sanjay Taxak and Dakshin within the meaning of K.R.S. § 337.010(1)(e). Likewise, at all relevant times, Hooda was an employee of Defendants Sanjay Taxak, Ajay Taxak and Subzi Mandi, within the statute.

159. At all times relevant to this action, Defendants Sanjay Taxak and Dakshin were the employers of the Aryas, and Defendants the Taxak brothers and Subzi Mandi were the employers of Hooda, within the meaning of K.R.S. § 337.010(1)(d).

160. Defendants failed to pay all wages due to Plaintiffs during the specified, monthly pay periods in violation of K.R.S. § 337.020.

161. Defendants failed to pay all wages due to Plaintiffs upon Plaintiffs' leaving employment in violation of K.R.S. § 337.055.

162. Defendants failed to pay Kentucky seventh day overtime to Hooda and Narender Arya on the days that they worked on the farm, in violation of K.R.S. § 337.050.

163. Defendants illegally deducted wages in violation of K.R.S. § 337.060.

164. Defendants failed to furnish Plaintiffs with a statement of wage deductions in violation of K.R.S. § 337.070.

165. Defendants failed to pay Plaintiffs minimum wages as required by K.R.S. § 337.275.

166.     On information and belief, Defendants failed to make, keep, or preserve pay records required by K.R.S. § 337.320 with respect to Plaintiffs.

167.     Defendants, in violation of K.R.S. § 337.365, required Plaintiffs to work without a rest period of at least ten minutes during each four hours worked.

168.     Defendants, in violation of K.R.S. § 337.325, failed to post in a conspicuous place at the place of Plaintiffs' employment a poster in Hindi setting forth their rights and protections under K.R.S. § 337.

169.     As a result of Defendants' violations of Kentucky's Wage and Hour Laws, pursuant to K.R.S. § 337.385, Plaintiffs are entitled to recover unpaid minimum and overtime wages, plus an additional equal amount in liquidated damages, reasonable attorney's fees, and costs of this action.

### THIRD CAUSE OF ACTION
### KRS CHAPTER 337 KENTUCKY HUMAN TRAFFICKING VIOLATION (Against Sanjay Taxak and Ajay Taxak)

170.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully here.

171.     Plaintiffs performed "labor" as that term is defined in K.R.S. § 529.010(7).

172.     Plaintiffs performed "services" as that term is defined in K.R.S. § 529.010(10).

173.     Plaintiffs were "restrained" as that term is defined in K.R.S. § 509.010, as Defendants induced Plaintiffs to accept employment through false representations and then limited Plaintiffs' ability to leave by confiscating their immigration documents and threatening physical violence.

174.     Because of this, Defendants Sanjay Taxak and Ajay Taxak were engaged in "human trafficking" as that term is defined in K.R.S. § 529.010(5)(a).

175.     Plaintiffs were subjected to forced labor or services by the Defendants as defined in the Kentucky Penal Code.

176.     Per K.R.S. § 337.385(3), Plaintiffs are entitled to "punitive damages not less than three (3) times the full amount of the wages and overtime compensation due, less any amount actually paid to such employee by the employer, and for costs and such reasonable attorneys' fees as may be allowed by the court, including interest thereon."

### FOURTH CAUSE OF ACTION
### PROMISSORY ESTOPPEL (Against Sanjay Taxak and Ajay Taxak)

177.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully here.

178.     As set forth above, Sanjay Taxak made a clear and unambiguous promise to Plaintiffs Meenu and Narender Arya that they would be paid at least $600 per week and would also receive lodging, food and legal assistance obtaining authorization to stay and work in the United States in exchange for their labor at the Dakshin restaurant.

179.     Also as set forth above, the Taxak brothers made a clear and unambiguous promise to Plaintiff Hooda that he would be paid at least $1,600 per month, with a raise to $1,800 per month in August 2011 and would also receive housing, food and legal assistance with his immigration status in exchange for his labor at the Subzi Mandi grocery store.

180.     The Taxak brothers reasonably expected these promises to induce Plaintiffs to provide labor services at the Dakshin restaurant and the Subzi Mandi grocery store.

181.     In reliance on the Taxak brothers' promises, Plaintiffs each provided consistent labor services six days per week, and sometimes more often, to the Taxak brothers at the Dakshin restaurant and Subzi Mandi grocery store.

182.     Defendants failed to pay Plaintiffs the full amount that was promised, failed to provide safe and habitable housing, and failed to procure the promised legal services.

183.     As a consequence of the Taxak brothers' refusal to honor their promises, Plaintiffs have been damaged financially in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### QUANTUM MERUIT (Against All Defendants)

184.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully here.

185.     From approximately January 2011 to June 2014, Hooda provided valuable labor services, as described above, to the Taxak brothers and the Subzi Mandi grocery store.

186.     From approximately November 2013 to June 2014, the Aryas provided valuable labor services, as described above, to Sanjay Taxak and the Dakshin restaurant.

187.     Plaintiffs expected to be fairly and equitably compensated for the services rendered to Defendants, the value of which is calculable.

188.     Defendants accepted Plaintiffs' services with knowledge that Plaintiffs expected to be paid and after representing to Plaintiffs that they would be paid.

189.     Defendants did not fairly and equitably compensate Plaintiffs.

190.     Plaintiffs should be compensated in quantum meruit in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT (Against All Defendants)

191.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully here.

192.    Defendants received good and valuable services from Plaintiffs in the form of three full-time laborers at the Dakshin restaurant and Subzi Mandi grocery store.

193.    Defendants failed to compensate Plaintiffs for the fair and equitable value of their labor at Dakshin restaurant and the Subzi Mandi grocery store.

194.    Plaintiffs were paid a grossly substandard rate that was significantly less than minimum wage and did not include overtime compensation.

195.    As a result, Defendants have been unjustly enriched at Plaintiffs' expense.

196.    It would be inequitable for Defendants to be permitted to retain such benefits without paying Plaintiffs the value of the benefits conferred.

197.    Defendants should be required to disgorge all gains which they obtained at the expense of Plaintiffs, and Plaintiffs are entitled to receive the disgorgement of Defendants' unjust gains as compensatory damages.

## SEVENTH CAUSE OF ACTION
## FRAUD (Against Ajay Taxak)

198.    Plaintiff Hooda realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully here.

199.    Defendant Ajay Taxak falsely told Hooda that, if Hooda loaned him $1,500, he would repay Hooda and provide Hooda with a job and legal assistance with his immigration case.

200.    These representations were materially false when made.

201.     Ajay never intended to repay Hooda for the $1,500 that he borrowed.  Ajay knew that his representations were false when he made them.

202.     Ajay made these representations to induce Hooda to send him $1,500.

203.     Hooda relied upon Ajay's false representations in transmitting $1,500 to Ajay and moving to Louisville.

204.     Despite Hooda's requests for the return of the money, Ajay never returned the $1,500 that he borrowed to Hooda.

205.     Ajay never arranged for legal assistance, or otherwise assisted, Hooda with his immigration status, despite Hooda's requests.

206.     Shortly after receiving the $1,500, after Hooda arrived in Louisville, Ajay falsely represented to Hooda that he would hold Hooda's valuables for safekeeping, including Hooda's immigration documentation and $1,400.

207.     These representations were materially false when made.

208.     Ajay never intended to return the $1,400 to Hooda.

209.     In reliance on Ajay's representations, Hooda entrusted Ajay with $1,400 in cash, as well as his passport, bond papers, and immigration documents.

210.     Hooda is entitled to the return of $2,900, the return of his passport and immigration documents, as well as punitive damages.

### EIGHTH CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATION (Against Sanjay Taxak)

211.     Plaintiff Hooda realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully here.

212. A person intentionally interferes with a prospective contractual relation of another when he "intentionally and improperly interferes with another' prospective contractual relation, . . . whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." Restatement (Second) of Torts § 766B (1979).

213. In 2013, Hooda accepted an employment opportunity offered by another local employer, who told Hooda that Hooda could work in his gas station.

214. Upon learning about this, Sanjay Taxak intentionally called the prospective new employer for the purpose of convincing the employer not to hire Hooda and to prevent Hooda from leaving his work at Subzi Mandi grocery store and the farm.

215. The other employer informed Hooda that Sanjay Taxak had called him and told him not to hire Hooda.

216. Sanjay Taxak's interference prevented Hooda from obtaining new employment, causing him to forego wages and benefits.

## NINTH CAUSE OF ACTION
### CONVERSION (Against Sanjay Taxak and Ajay Taxak)

217. Plaintiff Hooda realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully here.

218. Defendants Sanjay Taxak and Ajay Taxak wrongfully withheld Hooda's passport, bond papers and immigration documentation without authorization and to the exclusion of Hooda's ownership rights in the property.

219. As a result, Hooda is entitled to the return of the property and to compensatory and punitive damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Meenu Arya, Narender Arya and Sanjay Hooda, respectfully request that the Court grant them the following relief:

a.     Grant judgment in favor of Plaintiffs, and against Defendants, on the FLSA claims set forth in the First Cause of Action:

      i.     Award Plaintiffs unpaid minimum and overtime wages, plus liquidated damages, reasonable attorneys' fees, and the costs of this action; and,

      ii.     Declare that Defendants willfully violated the FLSA;

b.     Grant judgment in favor of Plaintiffs, and against Defendants, on the Kentucky Wage and Hour Laws and Kentucky Human Trafficking Violation claims set forth in the Second and Third Causes of Action:

      i.     Award Plaintiffs unpaid minimum and overtime wages, plus an equal amount in liquidated damages, reasonable attorney's fees, and punitive damages not less than three times the full amount of wages due, and costs of this action;

      ii.     Declare that Defendants willfully violated Kentucky law by subjecting Plaintiffs to forced labor without the minimum required pay;

c.     Grant judgment in favor of Plaintiffs, and against Defendants, on the promissory estoppel claim set forth in the Fourth Cause of Action, and award compensatory damages in an amount to be determined at trial;

d.     Grant judgment in favor of Plaintiffs, and against Defendants, on the quantum meruit claim set forth in the Fifth Cause of Action, and award restitution for the fair and equitable value of Plaintiffs' services in an amount to be determined at trial;

e.      Grant judgment in favor of Plaintiffs, and against Defendants, on the unjust enrichment claim set forth in the Sixth Cause of Action, disgorge the unjust benefits conferred upon Defendants, and award the disgorgement of unjust benefits as compensatory damages to Plaintiffs, in an amount to be determined at trial;

f.      Grant judgment against Defendant Ajay Taxak, and in favor of Plaintiff Sanjay Hooda, on the fraud claim set forth in the Seventh Cause of Action, including by awarding Hooda $2,900 in addition to prejudgment and post-judgment interest and punitive damages, and ordering the return of Hooda' passport, bond papers and immigration documentation;

g.      Grant judgment against Defendant Sanjay Taxak, and in favor of Plaintiff Hooda, on the claim of intentional interference with prospective contractual relations set forth in the Eighth Cause of Action, and award compensatory damages;

h.      Grant judgment against Defendants Ajay Taxak and Sanjay Taxak, and in favor of Plaintiff Hooda, on the claim for conversion as set forth in the Ninth Cause of Action, including by ordering the return of Hooda's passport, bond papers and immigration documents in addition to awarding compensatory and punitive damages;

i.      Award Plaintiffs prejudgment and post-judgment interest;

j.      Award Plaintiffs reasonable expenses and costs of court and attorney's fees; and

k.      Award Plaintiffs such other relief as this Court deems just and proper.

Dated: January 18, 2017             Respectfully submitted,

Craig Henry PLC
Aaron Bentley


/s/ Aaron Bentley
239 South Fifth Street, Suite 1400
Louisville, Kentucky 40202
Telephone:    (502) 614-5962
Facsimile:    (502) 614-5968
abentley@craighenrylaw.com

*Attorneys for Plaintiffs Meenu Arya, Narender Arya, and Sanjay Hooda*